UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CRIMINAL ACTION NO. 5:09-CR-181-KKC

UNITED STATES OF AMERICA                                             PLAINTIFF

v.                                        **OPINION AND ORDER**

BRYAN COFFMAN, ET AL.                                             DEFENDANTS

\* \* \*   \* \* \*   \* \* \*   \* \* \*

This matter is before the Court on the motions for final order of forfeiture (DE 640, 644) filed by Petitioners Megan Coffman, Dacorta, LLC, Baniel, LLC, and Corrie Anderson. For the following reasons, the motions will be GRANTED and a final order of forfeiture will be issued consistent with this opinion and order.

   **I.      Background**

After a jury trial, defendants Bryan Coffman and Gary Milby were found guilty of mail fraud, wire fraud, securities fraud, and money laundering. The indictment charged Bryan Coffman with running an investment scheme in which he defrauded investors by misrepresenting the value or existence of various oil and gas investments and transferred millions of dollars of investor funds into personal accounts. Megan Coffman, Bryan's wife, was also charged with multiple counts of money laundering with regards to the proceeds of the fraud but was acquitted of all charges.

The indictment charged that the fraud took place from 2004 through 2009 and that the Defendants implemented the scheme through three companies: Mid-America Energy, LLC, Mid-American Energy, Inc., and Global Energy Group. The indictment described two phases of the scheme: the Mid-America phase, which lasted from 2004 until early 2008, and the Global phase,

which lasted from mid-2007 until December 2009. At trial and in the forfeiture proceedings, the government proved that the proceeds derived from the fraud were at least $33,000,000. Securities and Exchange Commission Investigator Keith Hunger traced $19,300,000 in investor funds to the Mid-America phase of the scheme. United States Postal Inspection Service analyst Ryan Lee testified that investor deposits for the Global phase of the fraud totaled $16,197,125.02.

Bryan waived his right to a jury trial on the forfeiture allegations in the indictment. The government moved for a preliminary order of forfeiture with regard to $33 million, 13 financial accounts, two pieces of real property and a yacht, arguing that they were subject to forfeiture under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C). The first of those provisions pertains to money-laundering crimes and provides that that the Court must order that a defendant convicted of those crimes forfeit any property "involved in" the offense or any property that is traceable to the property involved in the offense. The term property "involved in" the offense includes "the money or other property being laundered (the corpus) . . . and any property used to facilitate the laundering offense." *United States v. McGauley*, 279 F.3d 62, 76 n. 14 (1st Cir. 2002) (quoting *United States v. All Monies in Account No. 90-3617-3*, 754 F. Supp. 1467, 1473 (D. Haw. 1991)).

The second forfeiture provision – § 981(a)(1)(C) – pertains to Bryan's mail- and wire-fraud convictions and provides that any property that constitutes or is derived from the proceeds traceable to such a violation is subject to forfeiture.

During the proceedings on the preliminary order of forfeiture, Bryan did not object to the forfeiture of three of the accounts containing investor funds.[1] These accounts are identified as Megan's American Founders Bank account 3826, Bryan's Wachovia account 4179, and Wachovia account 2871 under the name of American Oil & Gas. After briefing by the parties and a hearing, the Court issued an opinion in which it determined that the funds in all 13 of the financial accounts at issue were subject to forfeiture because they were involved in or facilitated money laundering. The Court denied the government's motion for forfeiture on one of the pieces of real property – the Coffmans' residence at 4816 Chaffey Lane. The Court determined that the second piece of real property – a condominium in South Carolina –  and the yacht were subject to forfeiture because they were both purchased with the proceeds of the crime and directly involved in money laundering.

On the government's motion, the Court later entered a second preliminary order of forfeiture, finding that certain additional pieces of property were subject to forfeiture as substitute assets under 21 U.S.C. § 853(p).  That provision provides that, where the government is unable to locate property subject to forfeiture, it can seize "substitute property" of the same value. The substitute property here consisted of two automobiles and eight pieces of real property located in Lexington, Kentucky, including the residence at 4816 Chaffey Lane.

Megan, her sister, Corrie Anderson, and two companies which are solely owned by Megan – Baniel, LLC and Dacorta, LLC – moved for an ancillary hearing pursuant to 21 U.S.C. § 853(n), asserting that they have a right to some of the forfeitable property. (DE 462, 463, 464,

---

[1] All of the accounts discussed in this opinion will be referred to by the bank where the account is located and the last four digits of the account number.

465). Megan and Dacorta assert an interest in the funds in a total of 11 bank accounts;[2] Megan asserts an interest in the eight pieces of real property located in Lexington; Baniel asserts an interest in the yacht; and Corrie asserts an interest in the South Carolina condo.

The Court permitted the parties to conduct discovery on these issues and to file motions for summary judgment. The Court denied motions for summary judgment by the U.S. and by the Petitioners and conducted hearings on March 5 and 6, 2013. (DE 633, 634).

## II.    Analysis

## A.    The 11 Financial Accounts

Megan asserts an interest in the funds in nine financial accounts held in her name. Her company, Dacorta, asserts an interest in the funds in two accounts.

As discussed above, this was an exceedingly profitable fraud, generating at least $33 million between 2004 and 2009. For that reason, the case presents an extremely complex money-laundering operation. USPIS analyst Lee testified that he reviewed a total of 57 bank accounts opened by Megan or Bryan at seven or eight banks, most of which were opened during the timeframe of the fraud. (DE 374, Lee Test. at CM-ECF p. 32; Ancillary Hr'g Govt. Ex. 28)

It appears that the government has been unable to track a huge portion of the total fraud proceeds. The accounts at issue in these ancillary proceedings contained less than $3 million at the time the government seized them. There is no dispute that more than half of the money in the accounts at the time of seizure consisted of direct proceeds from the fraud. To be exact, Megan concedes that $1,419,157.37 in these accounts consisted of direct proceeds of the fraud.  For this

---

[2]  After filing her initial petition, Megan has conceded that the funds in American Founders Bank account 3826 consist of solely investor funds and has dropped any claim to the funds in that account.  (DE 622, Response at CM-ECF p. 11.)

reason, the Court determined in its preliminary order of forfeiture that *all* of the funds in all of the accounts were subject to forfeiture because they were all involved in or facilitated the money laundering offenses.

Megan does not seek to obtain any of the known investor proceeds in the accounts. The government's rights to those funds vested at the time of the fraud that produced them. *See* 21 U.S.C. § 853(c) (providing that the government's interests in property subject to forfeiture vests at the time of the criminal act subjecting the property to forfeiture). But Megan asserts a right to the remaining $1,342,013.63 in the accounts. She argues she has a legal right to those funds that was vested at the time of the acts giving rise to the forfeiture and, thus, she is entitled to the funds under 21 U.S.C § 853(n)(6)(A).

Megan argues that, despite the complex money laundering operation, resolution of her claim to the funds is pretty simple. First, she argues, the Court should look to the names on the accounts. There is no dispute that each account is under the name of either Megan or Dacorta. Second, Megan argues that the Court should rule that Megan or Dacorta gets all of the funds in the accounts that the government has been unable to prove were the proceeds of the fraud.

There are several problems with this approach. First, it requires the Court to look past the money-laundering convictions and treat this case as if the only crimes committed were the fraud crimes. Megan argues that only the fraud proceeds can be forfeited. But Bryan was convicted of multiple counts of money laundering and of conspiring to launder money. The government proved that the funds in the 11 accounts at issue here were used in the money-laundering

operation. There is, in fact, no dispute about that. For this reason, the Court determined all of the funds were subject to forfeiture. *See, e.g., McGauley*, 279 F.3d at 77.[3]

This leads to a second problem with Megan's proposal. It wrongly puts the burden on the government in these ancillary proceedings. Pursuant to § 853(c), the government's right to all of the funds in the accounts vested at the time the money laundering was committed. If there were no third-party claimants, the government would be entitled to all of the money as the case now stands. Thus, in this ancillary proceeding, Megan has the burden to show that she and Dacorta – not the government – have a legal right to certain funds in the account despite the fact that they were all used in the money-laundering operation.

Another problem with Megan's proposed solution of this complicated forfeiture is that it requires the Court to rely solely on the names on the accounts in determining who has the right to the funds in them. Megan and Dacorta may be the names on the accounts, but title is not dispositive in an ancillary proceeding. "[B]are legal title, in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture." *United States v. $515,060.42*, 152 F.3d 491, 498 n. 6 (6th Cir. 1998); (citing *United States v. 526 Liscum Drive,* 866 F.2d 213, 217 (6th

---

[3] In support of her argument that the entire accounts were not subject to forfeiture but instead only the proceeds of the fraud, Megan has cited the Seventh Circuit's statement that "the presence of one illegal dollar in an account does not taint the rest – as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). In that case, "however, the government argued that the disputed funds were *proceeds* of unlawful activity, not that the funds were *involved in* unlawful activity, as the government argued here." *McGauley,* 279 F.3d at 77. *See $448,342.85*, 969 F.2d at 477 (stating "[m]oney need not be derived from crime to be 'involved' in it. . .That is not the United States' theory here, however; it treats these balances as proceeds.") In *McGauley*, the First Circuit pointed out that, after *$448,342.85*, the Seventh Circuit has stated that "even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds. " *United States v. Baker*, 227 F.3d 955, 979 n. 4 (7th Cir. 2000).

Cir. 1998)). "A failure to look beyond bare legal title would foster manipulation of nominal ownership . . ." *United States v. Henry*, No. 94-6188, 1995 WL 478635, at *2 (6th Cir. 1995) (citing *526 Liscum Drive*, 866 F.2d at 217). "The rationale for the rule that bare legal title may be insufficient [for standing] is based on a candid determination that things are often not what they appear to be. . . [P]eople engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name. In short, courts look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings of someone else." *United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001) (citation omitted). "It has been recognized that people engaged in illegal activities, especially when needing to conceal illegitimate funds and being aware of forfeiture statutes, often attempt to disguise their interests in property by not placing title in their own names." *United States v. One 1982 Porsche 928*, 732 F. Supp. 447, 451 (S.D.N.Y. 1990).

Bryan clearly exercised control over the accounts – so much control that, according to Megan, he was able to launder at least about $1.5 million through them without her knowledge. The jury determined that Bryan exercised sufficient control over the accounts to convict him – not Megan – of multiple counts of money laundering. As stated, more than half of the funds in the accounts at issue here were investor funds, all of which were deposited by Bryan.

Megan testified at the ancillary hearing that it was Bryan who directed the establishment of the account with the most funds in it – Raymond James account 2262. At the time of the government's seizure, account 2262 contained nearly $1.5 million. Megan testified that Brian orchestrated the transfer of all the funds from the couple's joint account at Raymond James – account 9062 – to an account under only Megan's name – account 2262 – and that he claimed

this was for "estate purposes." Megan asked no questions. Instead, she "followed his guidance." (DE 629-1, M. Coffman Dep. at CM-ECF p. 16.)  This occurred in February 2008, well after the fraud began.

Further, Megan testified that Bryan asked her to sign a $600,000 check from one of Dacorta's accounts leaving the payee blank and that, again, she complied without asking any questions – no questions regarding who the check was for or why it was being written.  Megan testified that she did this because Bryan was her husband and asked her to and agreed to pay it back. Whatever the reason, this is not the act of a person with complete dominion and control over her financial accounts.

Further, every single account at issue was established in the name of Megan or Dacorta not just after the fraud began but after about 30 investors from across the country brought suit in a Tennessee federal court asserting they had been defrauded in the Mid-America phase of the fraudulent scheme described in the indictment in this case. *Waldemar E. Albers Revocable Trust v. Mid-America, Inc.*, Case No. 3:07-421 (M.D. Tenn. filed April 16, 2007). The Tennessee suit was filed in April 2007. By June 2008, the plaintiffs in that case had served subpoenas on multiple banks requiring them to produce records regarding all of Bryan's accounts and any account for which he had signature authority. In August 2008, the plaintiffs served subpoenas on Megan and Bryan.

Megan has given no reason why she and Dacorta needed these 11 separate bank accounts, much less why she and Bryan needed 57 accounts. Given all of these circumstances, it is at least more likely than not that the very reason all of these accounts were established was to launder

the money that proceeded from the fraud and to hinder the victims of the fraud from collecting on judgments in civil cases.

Accordingly, the Court finds that, while the accounts are under the names of Dacorta and Megan, Bryan exercised control over them. They were opened for his purpose and use and he orchestrated the movement of enormous funds into and among the accounts. He was able to do so without Megan asking a single question regarding the source of the massive deposits into the accounts. This is consistent with the jury's finding that, even though certain accounts were in the name of Megan and Dacorta, it was Bryan who controlled them for money-laundering purposes. The fact that some legitimate funds may have been deposited into the accounts does not alter this finding. Legitimate funds are necessary for a money-laundering operation such as this.

Finally, in analyzing the claims of Megan and Dacorta, it is significant that the proceeds of the fraud dwarf the amounts in these accounts and the value of the forfeitable property as a whole. In such situations, courts have determined that it is the claimant's burden to demonstrate that the claimed funds were derived from lawful activities and are not the proceeds of the crime. "Probable cause to believe that the proceeds of the fraud exceed the balance of the account at the time of seizure justifies calling on the claimant to identify sums derived from lawful activities." *$448,342.85*, 969 F.2d at 477. *See also United States v. U.S. Currency Deposited in Account No. 1115000763247*, 176 F.3d 941, 947 (7th Cir. 1999) (stating that *$448,342.85* determined that "if the proceeds from the fraudulent scheme exceed the amount of money contained in the defendant bank account, and the claimant cannot identify monies in the account that were obtained from lawful sources, then the government is entitled to the entire balance of the account."); *United States v. Banco Cafetero*, 797 F.2d 1154, 1160-61 (2nd Cir. 1986) (holding that once the

government establishes probable cause to believe a bank account contains criminal proceeds, "the burden will then be on the claimant to demonstrate that no portions of the account . . . are 'traceable proceeds.'")

Here the government has proved that all of the funds in these 11 accounts were used in Bryan's money-laundering operation. It has also proved that the underlying criminal activities produced proceeds that far exceed the balance in these accounts. That showing justifies requiring that any claimant asserting a legal right to the funds in these accounts prove those funds were derived from lawful activities.

As to the accounts in the name of Dacorta, the parties have presented evidence of deposits of checks from companies called Travis Coomer Drilling, Barrett Oil, Aluminum Finishing and Arcadia. Both Megan and Dacorta claim income derived from checks written to Bryan by his former business partner, Frank Darrow.

Megan has also claimed that Dacorta derived income from the purchase of a distressed note owed by an inn in Abbeyville, South Carolina and from mortgage payments from her sister and brother-in-law for a condo in South Carolina. She has pointed to no evidence regarding the total sums derived from the Abbeyville note or from the mortgage payments deposited into these accounts. Furthermore, there is no dispute that the condo was purchased by Dacorta with investor funds.(DE 627-3, Lee Dep., Ex. 5; DE 374, Lee Trial Test. at CM-ECF pp. 91-94.)  Accordingly, Dacorta is not entitled to the mortgage payments owed on the note.

As to the income from Barrett Oil and Coomer Drilling, between February 22 and August 20, 2008 – a period of six months – checks from Barrett Oil to Dacorta totaling $ 446,629.01 were deposited into Dacorta's American Founders Bank account 9802 and PNC account 6953.

(Ancillary Hr'g Govt. Ex. 14.) As to checks from Travis Coomer, from January 9, 2008 to August 1, 2008, checks totaling $46,240.64 were deposited into Dacorta's American Founders account 9802. (Ancillary Hr'g Govt. Ex. 14.)

At the ancillary hearing, Megan testified that it was her understanding that the checks from both Barrett Oil and Travis Coomer were payments from an interest in a single oil well that she had purchased. As evidence of her investment, she points to a Division Order which shows that Dacorta has a .175 percent interest in the Danny Burris Lease operated by American Oil and Gas Resources. The Division Order is dated February 18, 2008. (Ancillary Hr'g Govt. Ex. 21.)

The Barrett Oil/Travis Coomer income invites a lot of questions. First, how much did Dacorta pay for this extremely fruitful investment? Megan has no records regarding the amounts Dacorta paid for the interest in the well. (DE 616 at 10.) Ryan Lee testified that the financial records of Megan and Dacorta contain no evidence of any expenditures related to an oil well. How did a .175 percent interest in a single well produce a half a million dollars in six months? Dacorta has no records demonstrating how much the well produced or the selling price of the oil. In fact the only records of the Dacorta/Coomer/Barrett relationship is the Division Order and the checks deposited into Dacorta's accounts. How did Dacorta pay for this investment? Megan has provided no explanation and does not know herself. Why did the payments suddenly stop? Megan testified that she never asked and was never told.

While there is a complete lack of evidence to support Megan's testimony that Dacorta purchased an oil interest from Travis Coomer or Barrett, there is evidence that it was actually Bryan who made a payment to Travis Coomer and that he made the payment with investor funds. The only check to Barrett or Travis Coomer Drilling Co. that the Court has seen in the record is

one from American Oil and Gas Resources, Inc. to Travis Coomer Drilling Co. signed by Bryan Coffman for $240,000 dated January 30, 2008, just before the date of the Division Order. (Ancillary Hr'g Govt. Ex. 21.)

In his deposition, Travis Coomer testified that he is the sole proprietor of Travis Coomer Drilling. (DE 628-1, Coomer Dep. at CM-ECF p. 9.) He testified that he could not recall why his company would have written checks to Dacorta instead of Bryan Coffman or Global. (DE 628-1, Coomer Dep. at CM-ECF pp. 28, 33.) He testified that he had no agreement with Megan Coffman and did not know he ever paid Megan anything. (DE 628-1, Coomer Dep. at CM-ECF p. 50.)

For these reasons, the Court does not find it more likely than not that Megan or Dacorta purchased an interest in an oil well with legitimate funds. It is more likely that the Coomer-Barrett income is due to Bryan's payment to Travis Coomer Drilling, which was made with investor funds.

As to the income from Aluminum Finishing, Megan testified that Dacorta purchased the Aluminum Finishing note for $550,000 and that these funds came from an account she and Bryan owned jointly at Central Bank with an account number ending in 9494. The bank statement from this account shows a deduction of $550,020 on August 18, 2006. (Ancillary Hr'g Ex. 36.) The Court is not aware of any allegation that account 9494 contained investor funds. Accordingly, the Court finds that Megan has offered sufficient evidence that the Aluminum Finishing note was acquired with legitimate funds.

Megan has not stated the total amount of the Aluminum Finishing payments. The Court has reviewed Trial Ex. No.456, which includes bank statements for Dacorta's American

Founders Bank account 9802 from September 2006 to September 2008. Those records reflect that a total of $307,000 from Aluminum Finishing was deposited into account 9802 during that time period. There is currently only $40,046.51 in account 9802 and all the parties agree that $10,000 of that consists of investor proceeds. (DE 556-1, Mem. at 21.) Accordingly, the Court will award Dacorta the remaining $30,046.51 in American Founders Bank account 9802.

On May 14, 2008, Megan transferred $700,000 from American Founders Bank account 9802 to Dacorta's PNC account 6953. (DE 464, Petition at 1.) Prior to the transfer, the Aluminum Finishing deposits into account 9802 totaled $259,000. (Trial Ex. 456.) Accordingly, the Court will award Dacorta $259,000 from PNC account 6953.

As to the Arcadia note, Megan testified at the ancillary hearing that Dacorta purchased this note in 2008 for $600,000. This was well after Bryan's fraud began. There is no evidence documenting a payment from Dacorta or Megan for the note. Megan testified that documents regarding the Arcadia note were missing for some time, including the time at which she was required to respond to the government's subpoena, but that she has since found evidence of the $600,000 wire transfer. If this evidence has been submitted, no party has pointed the Court to it. Accordingly, the Court cannot find it more likely than not that the Arcadia note was purchased with legitimate funds and the Court will not award Megan or Dacorta any income from Arcadia.

Finally, three checks from Frank Darrow to Bryan Coffman totaling $300,000 were deposited into Dacorta's PNC account 6953 and Megan's Traditional Bank account 3555. In his deposition, Darrow testified that he and Bryan Coffman were former partners in a business called CD Financial, Inc. Darrow testified that, in 2005, he approached Bryan about investing in a business unrelated to CD Financial called Saco. Darrow testified that he assured Bryan that if

Bryan would invest in the business, he would not lose any money. Darrow testified that he and Bryan ultimately lost $600,000 and that he felt an intense obligation to repay Bryan. He testified that the $300,000 in checks to Bryan represents his repayment of Bryan's losses. (DE 626-3, Darrow Dep, CM-ECF pp. 24-28.)

Each of the three checks from Darrow was written to Bryan Coffman. Darrow had no relationship with Megan or with Dacorta. They were written between July 12, 2008 and August 1, 2008. They were deposited into the accounts of Megan or Dacorta well after Bryan's fraud began and after the disgruntled investors had filed suit in Tennessee asserting they were victims of the Mid-America phase of the fraud. Megan testified that she thought Bryan gave her these funds just because he wanted her to have them. That may be true. But, it is more likely than not that the reason he wanted to put the funds into her accounts was so that he could hide them from plaintiffs in civil suits, criminal investigators, and future forfeiture, all of which were the likely results of Bryan's fraudulent activities.

As will be explained further below, Bryan's gift to Megan of the Darrow checks represents just a portion of the numerous similar transfers made after the Tennessee suit was filed. Considering all of these circumstances, the Court finds the transfer of the Darrow checks from Bryan to Megan and Dacorta are void under KRS § 378.010. *See United States v. Peterson*, 820 F. Supp. 2d 576, 582-83 (S.D.N.Y.); *United States v. Bennett*, No. 97-CR-639, 2003 WL 22208286 (S.D.N.Y. Sept. 24, 2003). That statute provides that any gift or transfer of any real or personal estate made with the intent to hinder creditors, purchasers or other persons is void.

For all these reasons, the Court will amend the preliminary order of forfeiture to omit $30,046.51 from American Founders Bank account 9802 and $259,000 from PNC account 6953.

**B.    The Yacht**

Megan's company, Baniel, holds title to the yacht. Megan is the sole owner of Baniel. Baniel purchased the yacht for $1.5 million. It paid $900,000 in cash and financed the remainder. The $900,000 cash was made up of $450,000 from Dacorta's American Founders Bank account 9802 and $450,000 from Megan's PNC account 1528. There is no dispute that the $450,000 from account 9802 consisted of investor funds.

Megan concedes that she used investor funds to purchase the yacht but argues that she received those funds as a bona fide purchaser under 21 U.S.C. §853(n)(6)(B). (DE 622, Mem. at 13.) In order for Megan to successfully make this claim she must show that, at the time she purchased the yacht, she was reasonably without cause to believe that the yacht was subject to forfeiture. In other words, she must show that, at the time she purchased the yacht, she was reasonably without cause to believe that the $450,000 from account 9802 was made up of proceeds from the oil-and-gas fraud.

Megan asserts that Bryan gave her the $450,000 to repay a loan. She testified at the ancillary hearing that he came to her a few days before the scheduled yacht closing and asked her for a loan of $600,000. She testified that he never told her why he needed it and she never asked. Instead, on July 28, 2008, she wrote him a check for $600,000, leaving the payee blank. Megan testified that, a few days later, on August 1, 2008, Bryan wrote her a check for $460,000 to repay the loan. There is no dispute that the $460,000 consisted of investor funds and that $450,000 of it

15

was ultimately used to purchase the yacht. Megan testified that she never learned and never asked why Bryan would need a loan of $ 600,000 if he was able to immediately repay it.

Again, the issue is whether Megan had no reasonable cause to believe that the $460,000 Bryan gave her consisted of the proceeds of the oil-and-gas fraud. Megan testified that, prior to writing the check to Bryan and before receiving the $460,000 back from him, she was aware of the Tennessee civil action by investors alleging they were victims of the Mid-American phase of the fraudulent scheme described in the indictment. Just a month before, the plaintiffs in the Tennessee case had subpoenaed Bryan's bank records at multiple banks.

Further, Megan was aware that, in a very short timeframe after that lawsuit was filed, Bryan had transferred an enormous amount of assets from his sole or joint ownership to Megan's name only. These assets included over a million dollars in Raymond James account 9062 (DE 374, Lee Trial Test. at CM-ECF pp. 78-79; DE 465-1, 465-2); $160,000 from Bryan's law office account into American Founders Bank account 3826 (DE 393-7); $200,000 from Bryan's Wachovia Bank Account 4179 into Megan's Traditional Bank Account 3555 (DE 627-3, Lee Dep. at CM-ECF pp. 18, 27, 29, Ex. 2, 3.); and, as will be discussed more below, five pieces of real property transferred from joint ownership to Megan's name. Bryan had also already given her $200,000 of the $300,000 in checks from Frank Darrow discussed earlier.

The question here is not what Megan actually believed about the source of the $460,000 but whether it was reasonable for her to have no cause to believe that the source was Bryan's oil-and-gas fraud. Given the totality of the circumstances, the Court cannot find that was reasonable.

For these reasons, the Court will not amend the preliminary order of forfeiture to omit the yacht.

## C. The Charleston Condo

Megan's sister, Corrie Anderson, holds title to the condo. She asserts that she is a "bona fide purchaser for value of the right, title, and interest" in the condo and was, "at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 853(n)(6)(B).

Anderson has produced sufficient evidence that she was a bona fide purchaser of the condo. There is no dispute that she borrowed $151,000 from Dacorta to purchase the condo. She signed a mortgage granting Dacorta a secured interest in the condo. The note is a 30-year note with interest at six percent. (DE 372, Anderson Trial Test. at CM-ECF p. 182.) Anderson has made payments on the note to Dacorta. Anderson testified that she made the payments from the income of her and her husband and there has been no evidence to the contrary.

Anderson has also proved that she did not become aware of Bryan's illegal conduct until the condo was searched in October 2008, which was months after she purchased it. She testified to this at the ancillary hearing. She testified at trial that she believed his wealth came from "wise investments" and a "prosperous" attorney practice. (DE 373, Anderson Trial Test. at CM-ECF p. 164.)

The government has not offered sufficient proof to the contrary. In its response to Anderson's motion for summary judgment, the government argued that there was a factual dispute as to whether Anderson was a "straw" owner for Bryan to protect the property from forfeiture. It has pointed to the fact that Anderson served as registered agent and that the condo served as the address for service of process for some of the Coffmans' companies.

Anderson testified that she served as registered agent for Baniel, Dacorta, American Oil and Gas Resources, and MAC Financial, another of Megan's companies. However, she further testified that she did not know what any of these companies did and that she never asked Bryan or Megan what they did. Anderson testified that it was her intent for the condo to serve as a residence for her and her husband and that there was never any plan for Bryan or Megan to live in or operate a business out of the condo.

Because the duties of a registered agent are minimal, the fact that Anderson served in that capacity for certain businesses does not prove she was aware of any illegal conduct. It is true that Anderson no longer lives in the condo. Nevertheless, she testified that this was because her husband got a job at a camp on Seabrook Island and the camp director had invited the couple to live on the island. She testified that she currently rents the condo out for which she receives $930 per month.

Weighing all of the evidence, the Court concludes that Anderson purchased the condo with no knowledge of any illegal activity by Bryan. Accordingly, the Court will amend the preliminary order of forfeiture to omit the South Carolina condo.

### D.     The Eight Pieces of Real Property in Lexington

The Court ordered that the eight pieces of real property at issue were subject to forfeiture as substitute property pursuant to 21 U.S.C. § 853(p).

Megan and Bryan jointly purchased all the eight pieces of real property at issue and held them in a tenancy by the entirety. The Coffmans still jointly own three of the properties: 2556 Ashbrooke Drive; 3200 Mammoth Drive; and 3152 High Ridge Drive.

However, in 2007, Bryan transferred all of his interest in five of the properties to Megan. These properties were 4752 Firebrook Blvd.; 3805 Arrowhead Drive; 873 Forest Green Drive; 4200 Steamboat Road; and 4816 Chaffey Lane. Megan did not pay Bryan anything for his interest in the properties.

Megan argues that the government cannot seize any of these five properties because Bryan no longer has any interest in them. However, the government argues that Bryan's conveyances to Megan were fraudulent and made in attempt to avoid creditors. (DE 552, Reply at 3). Thus, the government argues, the conveyances are void under KRS § 378.010, the Kentucky statute discussed above. *See Peterson*, 820 F. Supp. 2d at 582-83; *Bennett*, 2003 WL 22208286.

The issue with regard to these properties then is whether the government has presented sufficient evidence that Bryan's transfer of his interest in the five properties was done with the intent to hinder creditors or other persons. It has. Bryan transferred his interest in the properties to Megan approximately eight months after the Tennessee action was filed by investors alleging they had been defrauded during the Mid-American phase of the scheme described in this indictment. Tammy Martinez, a paralegal in Bryan's law firm at the time of the transfers, testified at the ancillary hearing that Bryan told her he was transferring the property because someone was suing him and he was concerned that person may go after his assets.

Megan has presented no credible alternative explanation as to why Bryan transferred the properties to her. At the hearing, she testified that Bryan told her he was transferring the properties to her for "estate purposes." Megan has presented no evidence or argument as to how the Coffman estate would have benefitted from the transfer of the properties to Megan.

The government has proved by a preponderance of the evidence that Bryan transferred the properties to Megan in order to hinder the victims of the fraud from collecting on judgments in civil cases and to hinder the government in any investigation and forfeiture emanating from Bryan's fraudulent activities.

Accordingly, the Court finds that Bryan's transfer of his interests in these properties to Megan on December 10, 2007 is void and that Bryan retains his interest in all of these properties. Megan and Bryan continue to jointly own these properties in a tenancy by the entirety.

Thus, the Coffmans own all eight pieces of Lexington real estates as tenants by the entirety. Bryan's interest in all of these properties is forfeitable. Under Kentucky law, "[a] tenancy by the entirety is an estate in land shared by husband and wife, whereby at the death of either the survivor is entitled to full fee simple ownership." *Sanderson v. Saxon*, 834 S.W.2d 676, 678 (Ky. 1992). "A distinguishing feature of a tenancy by the entirety is that the survivor takes the entire estate at the death of the deceased co-tenant *not* by virtue of that death, but because, in law, each was viewed to own the *entire* estate from the time of its creation." *Id*.

A tenancy by the entirety "creates one indivisible estate in them both and in the survivor, which neither can destroy by any separate act." *Hoffmann v. Newell,* 60 S.W.2d 607, 609 (1933). "Alienation by either the husband or the wife will not defeat the right of the survivor to the entire estate on the death of the other. There can be no severance of such estate by the act of either alone without the assent of the other, and no partition during their joint lives, and the survivor becomes seised as sole owner of the whole estate regardless of anything the other may have done." *Id*.

A Kentucky statute provides that "[l]and to which the defendant has a legal or equitable title in fee, for life or for a term, whether in possession, reversion or remainder, or in which the defendant has a contingent interest or a contingent remainder or a defeasible fee, may be taken and sold under execution." KRS § 426.190. Courts have determined that, "[u]nder this statute, creditors of a debtor-spouse may attach and sell under execution a debtor's contingent interest or expectancy of the fee in property held as tenants by the entirety." *In re Brumbaugh*, 250 B.R. 605, 608 (W.D. Ky. 2000) (citing *Hoffman*, 60 S.W.2d at 613.). "The 'interest' which creditors may attach and sell, however, is the debtor-spouse's right of survivorship, subject only to the possibility that the non-debtor spouse will outlive the debtor spouse, in which case the holder of the right of survivorship takes nothing." *Id*.

Consistent with this law, where one of the spouses owning property in a tenancy by the entirety is convicted of a crime subjecting his property to forfeiture:

- the criminal defendant's spouse has the vested right and title to the exclusive ownership of the entire property during her life time;

- if she survives the criminal defendant, "she would then be vested with full title to the Property in fee simple, regardless of any interest the United States may acquire through her husband;"

- The government cannot sell the property during the period in which it is held by the criminal defendant's spouse as a tenant by the entirety with the right of survivorship;

- If the criminal defendant survives his spouse, then the government receives title to the property in fee simple; and

- the government may only sell the criminal defendant's contingent estate in the property. But such a sale does not defeat his spouse's current right to and interest in the estate.

21

*United States v. Real Property Located at 5202 Mount Howard Court*, 755 F. Supp. 169, 173 (W.D. Ky. 1990). *See also United States v. Certain Real Property Located at 2525 Leroy Lane*, 910 F.2d 343 (6th Cir. 1990) (applying Michigan law regarding tenancy in the entirety).

Accordingly, the Court will not amend the preliminary order of forfeiture to omit the eight pieces of real property located in Lexington, Kentucky. Nevertheless, only Bryan's interest in the property is forfeitable, as described above. Megan's interest in the property as a tenant by the entirety with right of survivorship is not forfeitable.

### III. Conclusion

For these reasons, the Court hereby ORDERS as follows:

1) the motions for final order of forfeiture (DE 640, 644) filed by Petitioners Megan Coffman, Dacorta, LLC, Baniel, LLC, and Corrie Anderson are GRANTED;

2) the preliminary order of forfeiture will be amended to omit $30,046.51 from American Founders Bank account 9802 and $259,000 from PNC account 6953; the South Carolina condo; and Megan's interest in the eight pieces of real property located in Lexington, Kentucky; and

3) the Court will enter a final order of forfeiture consistent with this Opinion and Order.

Dated this 31st day of January, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY